[Cite as *Bryan v. Bryan*, 2012-Ohio-3691.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 97817**

---

# INGRID BRYAN

PLAINTIFF-APPELLEE

vs.

# PHILIP BRYAN

DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No.   D-331957

**BEFORE:**   Blackmon, A.J., Cooney, J., and Rocco, J.

**RELEASED AND JOURNALIZED:**      August 16, 2012

**ATTORNEY FOR APPELLANT**

Jill Friedman Helfman
Taft Stettinius & Hollister LLP
200 Public Square
Suite 3500
Cleveland, OH 44113

**ATTORNEY FOR APPELLEE**

Pamela J. MacAdams
Morganstern, MacAdams & Devito Co., LPA
623 West St. Clair Avenue
Cleveland, OH 44113

**GUARDIAN AD LITEM**

Mary J. Biacsi
Zoller Biacsi Co., LPA
812 Huron Road
490 The Caxton Building
Cleveland, OH 44115

PATRICIA ANN BLACKMON, A.J.:

{¶1}   Appellant Philip Bryan ("husband") appeals the domestic relations court order involving spousal support and the division of marital property division.   He assigns four errors for our review.[1]

{¶2}   Having reviewed the record and pertinent law, we affirm the trial court's decision.   The apposite facts follow.

### Facts

{¶3}   In 1988, after graduating from college, the parties began living together and became engaged to be married; they were married in September 1994, and three children were born of the marriage (O.B., dob: 9-11-1997, G.B., dob: 4-13-1999, and A.B., dob: 4-17-2001).   The parties separated in January 2011.

{¶4}   After college, both parties went on to have successful careers.   Husband worked for Dunn and Bradstreet from 1988 until 1996.   He then worked for American Credit Indemnity until 2002.    In 2004, he started his company, Trade Credit International ("TCI").   TCI acts as a brokerage company for credit insurance to protect against the risk of defaulted accounts receivables and nonpayment of commercial debt. Husband is the sole shareholder and employee of the company and has a home office. An expert at trial valued husband's business to be worth $144,479.   The expert also determined that husband's income in 2009 was $187,000 and $145,000 in 2010.

---

[1] *See* appendix.

**{¶5}** The wife worked from 1980 until 1987 at Mobay Corporation as a foreign transfer coordinator and English-German translator. After college she worked for Alcan Rolled Products as a sales support specialist. She received several promotions throughout the years and became the product manager in 1999, earning between $70,000 and $80,000 per year. In 2000, she left Alcan to become a stay-at-home mom.

**{¶6}** In 2007, wife formed a desktop publishing company with her friend that operated out of the marital home. Due to a lawsuit and the enforcement of a noncompete agreement, the company ceased doing business in 2010. At the time the operations ended, the publishing company had no assets, and attorney fees were owed for defending the lawsuit. Due to her alleged inability to find employment elsewhere, wife has earned money cleaning homes. She currently cleans two homes about every other week for $50. A vocational expert testified at trial that wife, in spite of her age of 50, would be employable given her strong work history and professional demeanor.

**{¶7}** After several days of trial, the trial court entered a divorce decree and determined the de facto marriage commencement date for purposes of property division was November 1988, when the parties began living together and became engaged. Wife was awarded the marital residence and husband was awarded TCI. The parties also stipulated to the value of their property, except as to husband's business. However, the court accepted the expert's valuation of the company at $144,479.

**{¶8}** The trial court ordered husband to pay $5,000 per month in spousal support to wife for nine years. After considering husband was paying for the children's health

insurance, the court ordered husband to pay $525 per month in child support. (If he was not paying for the health insurance, his child support obligation would have been over $1,000 per month.)

{¶9} The court also incorporated the parties' shared parenting agreement into the decree and divided the investment accounts, pension funds, personal property, and various debts that are not at issue in this appeal.

## Date of Marriage

{¶10} In his first assigned error, husband contends the trial court erred by concluding the parties were married six years prior to the ceremonial date of their marriage for purposes of the marital property division. He claims this prejudiced him because the trial court included investments made prior to the marriage, specifically, the downpayment on the marital home, which was $50,000. Additionally, he claims the trial court's use of the prior date violates the Marriage Amendment to the Ohio Constitution and in effect resurrects the common law marriage doctrine.

{¶11} R.C. 3105.171(A)(2)(b) provides the court with authority to select a date other than the ceremonial wedding date for purposes of equitably determining what comprises the marital estate for a division of property assessment. *D'Hue v. D'Hue,* 8th Dist. No. 81017, 2002-Ohio-5857. R.C. 3105.171(A)(2) provides:

**(2) "During the marriage" means whichever the following is applicable:**

**(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation.**

**(b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.**

{¶12} For purposes of appellate review, a trial court's determination of a de facto marriage date is subject to an abuse of discretion standard. *Berish v. Berish*, 69 Ohio St.2d 318, 323, 432 N.E.2d 183 (1982); *Gullia v. Gullia*, 93 Ohio App.3d 653, 666, 639 N.E.2d 822 (8th Dist.1994).

{¶13} According to wife, when the parties commenced living together, they did not have much financially. They both were working at the time and earning approximately the same income. Wife testified that they "pretty much split things, the rent, and utilities, and food for the home, or things we started to purchase and accumulate for the household." She also stated that "there was a time when he would pay the rent one month and I would pay the rent one month." She explained that they had no formal plan on how to pay for things and admitted that "he probably picked up a lot of the rent and utilities and I picked up the food and the furniture and maybe vacations or things like that."

{¶14} Husband testified that prior to the marriage, he paid for "most everything." He also claimed that he alone saved money and contended he provided all of the funds for

the downpayment on their home. However, husband did admit that wife paid for day-to-day purchases, such as food and that her contributions helped to a "certain degree" to help save for a home. Thus, the trial court was presented with two different versions of the parties' financial life prior to being married and concluded that wife was more credible than husband. The credibility of witnesses is primarily a matter for the trier of fact. *McCoy v. McCoy*, 91 Ohio App.3d 570, 575-576, 632 N.E.2d 1358 (8th Dist.1993).

{¶15} The court concluded that it would be inequitable to not take into consideration the fact that wife worked for six years prior to the marriage and used her income to help contribute to their living expenses, which allowed the parties to save the money for a downpayment on a residence after they were married. Under the statute and the historical case law, the trial court did not abuse its discretion in deciding the de facto marriage date to be when the parties became engaged and moved in together.

{¶16} Husband also argues the trial court's setting the commencement date of the marriage six years prior to the actual ceremonial date, violated the Marriage Amendment of the Ohio Constitution. Art. XV, Section 11 of the Ohio Constitution is commonly known as the "Marriage Amendment." The Marriage Amendment states:

**Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and is political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage.**

**{¶17}** Husband argues that the trial court's extending the duration of the marriage to include the six years prior to the party's ceremonial marriage bestows legal recognition to unmarried couples prohibited by the Marriage Amendment. According to husband's argument, trial courts are prohibited from using R.C. 3105.171(A)(2)(b) to extend a marriage date to anytime prior to the ceremonial marriage date when determining the equitable division of property. We disagree.

**{¶18}** Courts are to liberally construe a statute in order to save it from constitutional infirmities. *Lebanon v. McClure*, 44 Ohio App.3d 114, 116, 541 N.E.2d 1073 (12th Dist.1988). "[I]f by any fair course of reasoning, the law and the constitution can be reconciled, the law must stand." *State v. Carswell*, 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547, ¶ 9.

**{¶19}** R.C. 3105.171(A) was enacted in 1991. "'[T]he general rule as to the interpretation of constitutional amendments is that "[t]he body enacting the amendment will be presumed to have had in mind existing constitutional or statutory provisions and their judicial construction, touching the subject dealt with."'" *Carswell*, citing *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic*, 62 Ohio St.3d 297, 581 N.E.2d 1086 (1991), quoting *State ex rel. Engle v. Indus. Comm.*, 142 Ohio St. 425, 432, 52 N.E.2d 743. Thus, we proceed with the presumption that the drafters of the proposed constitutional amendment and the voters who approved it knew of R.C. 3105.171(A) and its purpose to allow the domestic relations court to make an equitable distribution of marital property. *See Carswell*.

**{¶20}** In *Carswell*, the Ohio Supreme Court addressed the argument that Ohio's domestic violence statute was unconstitutional under the Marriage Amendment because it recognized a "legal status for relationships of unmarried individuals that was comparable to marriage." In rejecting the argument, the Supreme Court explained the difference between the institution of marriage and other kinds of relationships as follows:

> **[B]eing married is a status. Marriage gives a person certain legal rights, duties, and liabilities. For example, a married person may not testify against his or her spouse in some situations. R.C. 2945.42. A married person may inherit property from a spouse who dies intestate. R.C. 2105.06. The definition of "status," our understanding of the legal responsibilities of marriage, and the rights and duties created by the status of being married, combined with the first sentence of the amendment's prohibition against recognizing any union that is between persons other than one man and one woman, causes us to conclude that the second sentence of the amendment means that the *state cannot create or recognize a legal status for unmarried persons that bears all the attributes of marriage — a marriage substitute.*** (Emphasis added.)
> *Carswell* at ¶ 13.

**{¶21}** "Thus, the Ohio Supreme Court explained that any legally established relationship bearing less than all the attributes of marriage is constitutional." *Cleveland Taxpayers for Ohio Constitution v. Cleveland*, 8th Dist. No. 94327, 2010-Ohio-4685

(City's domestic partner registry did not violate the Marriage Amendment because it did not give partners all of the attributes of a marriage). *See also Fitz v. Fitz,* 8th Dist. No. 92535, 2009-Ohio-5236 (Marriage Amendment does not prevent courts from making factual determination of cohabitation because "cohabitation" does not confer a legal status tantamount to marriage). Likewise, here, the court only looked at the years the parties lived together for purposes of making an equitable distribution of property. The court's doing so, did not give the parties' relationship prior to the marriage all of the attributes of a marriage. The date was only extended for purposes of making an equitable distribution of the property.

{¶22}  R.C. 3105.171(A) also does not mandate that a marriage commences every time parties live together. The provision simply provides the trial court with the discretion to apply an earlier date if the facts require it in order to make an equitable distribution of property. In the instant case, the parties were engaged for the six years they lived together, earned approximately the same income, and evidence was presented they shared living expenses, which allowed husband to accrue savings to use to purchase their marital home. Under these circumstances, it was equitable for the trial court to consider the six years prior to marriage in determining the division of the property. The parties shared expenses and showed an intent to eventually marry because they were engaged during the entire time. Thus, the parties were able to make a downpayment on the marital home based on their pooling their income to pay expenses prior to the

marriage. This is not a situation where the husband owned the home prior to the marriage.

{¶23} Husband also claims commencing the marriage six years prior to the ceremonial marriage violates Ohio's law against common law marriage. In 1991, Ohio enacted R.C. 3105.21, which abolished common law marriages in Ohio. This is the same year that Ohio enacted R.C. 3105.171(A)(2). R.C. 3105.171(A)(2) can only be used when a legally married couple seeks to terminate their marriage. Thus, it does not allow for common law marriage. Accordingly, husband's first assigned error is overruled.

## Spousal Support

{¶24} In his second assigned error, husband contends the trial court's award of spousal support in the amount of $5,000 per month for 108 months was onerous, and the trial court failed to consider wife's ability to earn money pursuant to R.C. 3105.18.

{¶25} A trial court has considerable latitude when determining the amount of spousal support to award in a divorce proceeding. *Bolinger v. Bolinger*, 49 Ohio St.3d 120, 122, 551 N.E.2d 157 (1990). A trial court's decision regarding spousal obligations will not be reversed on appeal absent an abuse of discretion. *Pauly v. Pauly*, 80 Ohio St.3d 386, 390, 1997-Ohio-105, 686 N.E.2d 1108; *Cherry v. Cherry*, 66 Ohio St.2d 348, 421 N.E.2d 1293 (1981). If the decision of the trial court is supported by some competent, credible evidence going to all the essential elements of the case, it will not be disturbed on appeal. *Masitto v. Masitto*, 22 Ohio St.3d 63, 66, 488 N.E.2d 857 (1986).

**{¶26}** In deciding whether the amount of spousal support is "appropriate and reasonable," the trial court must consider the factors listed in R.C. 3105.18(C)(1). *Id.* The factors the trial court must consider include each party's income, earning capacity, age, retirement benefits, education, assets and liabilities, and physical, mental and emotional condition; the duration of the marriage; their standard of living; inability to seek employment outside the home; contributions during the marriage; tax consequences; and lost income due to a party's fulfillment of marital responsibilities. R.C. 3105.18(C)(1)(a)-(m). In addition, the trial court is free to consider any other factor that the court finds to be "relevant and equitable." R.C. 3105.18(C)(1)(n).

**{¶27}** It is with the above standards in mind that we now address the case at bar. We find the record to be replete with evidence supporting the trial court's decision. The parties were married for 17 years at the time of the divorce and together for 23 years. Thus, they had been a couple for a long time. Wife has not worked for over 11 years, except for her failed attempt to start publishing a community newspaper, as she left the work force to care for the parties' young children. She is also 50 years old. The court concluded that wife's age and time away from the work force are issues that handicap her ability to find a job in spite of her impressive work experience. Also, although her children are no longer little, they are still young, which prevents her from being able to travel as extensively as her prior positions had required, and she will not be able to work late hours. Therefore, it is unrealistic to expect her to assume the same type of position that she had held previously.

{¶28} The court also found that husband makes considerably more than wife. Wife currently earns $100 every other week cleaning homes. Husband contends that he makes $97,000 per year; however, based on the expert testimony presented, the court concluded his salary was $145,000 per year. The court also considered that after the divorce, wife will have to pay for her own health insurance. Although she is in good health, it is still an expense she will have to bear.

{¶29} Husband also contends the trial court unfairly used his income in determining the value of TCI in order to divide the marital property and also used the same amount to base its award of spousal support. He argues this "double dipping" is prohibited and cites *Heller v. Heller*, 195 Ohio App.3d 541, 960 N.E.2d 1055 (10th Dist.2011), for support. In *Heller*, the husband owned 39.5 percent interest in the company for which he received a salary. He was awarded his entire interest in the company, which was valued at $700,018, which excluded his $300,000 salary. However, along with being ordered to pay $8,000 per month in spousal support based on the $300,000 salary, the trial court also awarded wife "20 percent of each payment of additional gross or, pre-tax income" that husband was paid as a bonus in the future. The Tenth District, held that awarding her the future bonus income resulted in double dipping because it was based on future earnings of the company, which the court included in valuing the company. The court held, however, that the salary husband received from the business could be considered in determining spousal support.

**{¶30}** In the instant case, in determining the amount of the company's cash flow, the expert reviewed TCI's bank statements. These statements reflected that the company paid husband for his salary. Therefore, in using the balance set forth on the statements, husband's salary was not included as part of the cash flow. The expert did consider husband's income in determining the book value of the company, or the intangible value of the business, however, it was not a representation of the cash flow. Therefore, no "double dipping" occurred by the trial court using the amount of husband's salary to determine his spousal support.

**{¶31}** Based on the trial court's consideration of these factors, the trial court did not err in requiring husband to pay $5,000 per month in spousal support. Having said that, we acknowledge that wife is educated and has an exemplary work history from 11 years ago. Given that the support is for nine years, it is likely she will begin seeking employment now instead of waiting until she is 59 to seek employment. In fact, she testified that she had applied for approximately 25 positions in the months leading up to the trial; thus she is attempting to find employment. If her circumstances should change, and she begins to accrue an income, husband can then request a modification pursuant to R.C. 3105.18(E) based on a change in circumstances. Accordingly, husband's second assigned error is overruled.

## Valuation of Business

**{¶32}** In his third assigned error, husband argues the trial court erred in accepting the expert's valuation of his business.

**{¶33}** Husband contends that his business has no commercial value because he is the sole shareholder and employee of the company, which has no assets because he works from home. However, the expert explained that although TCI did not have good will, it did have book business value. As the expert in his report explained, he looked to what the value of the company would be if husband sold it:

> **When I consider the nature of this operation, I have concluded that essentially two elements exist that can create value. First the company has cash balances in excess of any required working capital, and second the company has a book of business that has some level of portability to a seller without the continued involvement of the seller.** Expert Report, page 7.

**{¶34}** He further clarified at trial:

> **The businesses are bought and sold and determining that fair market value is fundamentally what we do as business evaluators. I broke this business down past that because I didn't feel that anybody would buy trade credit. What I do is determine that the value of the business book of business, the accounts, relationships, that he, Mr. Bryan, has are transferable because someone else could come in and either absorb him into his business and pay them and maybe even a recommendation to work for them and establish 100 percent transfer of those, or they could buy that book of business.** Sept. 13, 2011, Tr. 26.

**{¶35}** To figure the book value, the expert applied a formula and determined the book value was $38,911. He used a very conservative formula in determining the book value because he admitted it was a "highly volatile business." The expert then added the excess cash flow of the company as of December 31, 2010, in the amount of $105,568, to the book value to arrive at a total company value of $144,479. Therefore, based on these calculations, the expert was able to determine the value of the company.

**{¶36}** Husband also argues that the expert failed to accurately determine his expenses in calculating the company's cash flow because the expert relied upon husband's tax returns, which the expert stated were inaccurate. The expert testified:

> **The expense side of this was difficult for me to determine because the business expenses were paid for personally and then imputed back to the business, and for my business expense I went through the tax returns for the years that I had and identified what the expenses were on average and I used that as an expense.** Sept. 13, 2011, Tr. 23.

**{¶37}** The expert could only base his report on the information provided to him and all he had was the tax returns. The expert believed the amount claimed on the returns in the amount of approximately $2,000 per month seemed reasonable. Husband does not contend better evidence existed to determine his expenses; therefore, we conclude in the absence of better evidence, beyond husband's self-serving statements, the expert did not err by using the tax returns to determine an average amount of expenses to be deducted.

**{¶38}** Husband also contends that in determining the book value, the expert used a faulty income comparison. Husband contends he was merely an insurance agent and that the going salary was a lot less than the expert ascribed to him. However, the expert testified that because husband owned his insurance company, he used a salary more akin to that of an executive. "The fact that I increased that number was to calculate what a reasonable buyer would expect to receive for putting in the effort of taking the risk of being the owner of a company." Sept. 13, 2011, Tr. 39. Husband failed to present evidence to contradict the expert.

**{¶39}** The trial court had to weigh the expert's testimony with that of husband and determine who was more credible. Given that evidence was presented that husband's tax returns were false and that he had concealed money in his safe, the trial court did not abuse its discretion in finding the expert's opinion as to the value of the company to be more credible than husband's. Accordingly, the third assigned error is overruled.

### Custodian of Children's Accounts

**{¶40}** In his fourth assigned error, husband contends the trial court erred by designating wife as the custodian of the children's custodial accounts. He claims that he should be the custodian as he has shown the ability to successfully manage the marital finances and previously successfully managed the custodial accounts.

**{¶41}** The children had 14 separate custodial accounts, which were created to finance their college education. The trial court concluded that wife should be the custodian of the accounts and did not set forth its reasons for doing so. However, the evidence indicated that husband's company books included fabricated tax returns and he concealed large amounts of cash and undeposited checks in his safe, which he failed to tell the expert about until wife discovered them. Under these circumstances, wife appears to be the more trustworthy person to oversee the children's accounts. Accordingly, husband's fourth assigned error is overruled.

**{¶42}** Judgment affirmed.

It is ordered that appellee recover from appellant her costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, ADMINISTRATIVE JUDGE

COLLEEN CONWAY COONEY, J., and
KENNETH A. ROCCO, J., CONCUR

## APPENDIX

## Assignments of Error

**I.   The trial court erred by using a date six years prior to the parties' marriage to determine the "duration of the marriage" and the parties' respective property rights, thereby defeating appellant's valid separate property claim under R.C. 3105.71.**

**II.   The trial court erred by awarding appellee an unreasonable and inappropriate amount of spousal support when it ordered husband to pay spousal support based on fictional income, thereby rendering Mr.**

Bryan unable to pay the basic living expenses for himself and the children.

**III.** The trial court abused its discretion by accepting John Davis' report in total, since a sales job has no fair market value.

**IV.** The trial court erred by ordering that appellee replace Mr. Bryan as custodian of the children's fourteen custodial accounts.