[Cite as *Gentile v. Gentile*, 2013-Ohio-1338.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 97971**

---

# MARY M. GENTILE

PLAINTIFF-APPELLANT
and CROSS-APPELLEE

vs.

# RICHARD D. GENTILE

DEFENDANT-APPELLEE
and CROSS-APPELLANT

---

## JUDGMENT:
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. D-334239

**BEFORE:** Kilbane, J., S. Gallagher, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** April 4, 2013

**ATTORNEYS FOR APPELLANT**

Scott S. Rosenthal
Adam J. Thurman
Schoonover, Rosenthal, Thurman, & Daray, L.L.C.
1001 Lakeside Avenue
Suite 1720
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

Carl A. Murway
Thomas J. Lee
Taft Stettinius & Hollister, L.L.P.
200 Public Square
Suite 3500
Cleveland, Ohio 44114

Christopher P. Lacich
Roth Blair
100 East Federal Street
Suite 600
Youngstown, Ohio 44503

MARY EILEEN KILBANE, J.:

**{¶1}** Plaintiff-appellant, Mary Gentile ("wife"), appeals from the final decree issued by the Domestic Relations Division of the Cuyahoga County Common Pleas Court in her divorce from defendant-appellee, Richard Gentile ("husband"), and assigns four errors for our review. The husband cross-appeals and assigns eight errors for our review. Because we have determined that none of the assignments of error are meritorious, we affirm the final decree of divorce.

**{¶2}** The parties were married on June 10, 1986. They had two children, one son who is now emancipated, and a second son born in 1995. The wife has a bachelor's degree and, apart from brief employment for Nutrisystem, has worked primarily as a homemaker for the duration of the marriage. The husband is a board certified plastic surgeon and has a master's degree in business administration. He is the sole shareholder and sole practitioner of Otolaryngology Head and Neck consultants in Youngstown, Ohio.

**{¶3}** The parties have had an acrimonious relationship, and the wife has filed for divorce in 2001, 2003, 2004, and 2008, but she later dismissed each of her divorce complaints. She filed the instant matter on November 16, 2010. The record indicates that in November 2010, the husband filed a complaint for divorce in Mahoning County, the county that the parties had resided in prior to June 2009, but the husband's complaint was later dismissed for lack of proper venue.

{¶4} On March 21, 2011, the trial court awarded the wife temporary support, pendente lite. Within this order, the court concluded that the husband earned between $500,000 and $1,000,000 per year, and it ordered the husband to pay the wife $8,500 per month as spousal support; the mortgages and various expenses for the parties' homes in Solon, Ohio, and Bradenton, Florida; tuition and expenses for their youngest son, J.G.; unreimbursed medical expenses; and car payments. The court also released $150,000 to each party for expenses.

{¶5} On November 14, 2011, the parties entered into a Custody Agreement that designated the wife as residential parent and legal custodian of J.G.

{¶6} Prior to trial, the parties stipulated that they have $1,408,966 in retirement accounts (Morgan Stanley and American Funds), and $4,866,705 in investments (American Funds, Vanguard, and Morgan Stanley). The parties also stipulated that the Solon home and the Bradenton home and the contents of each would be sold and the proceeds divided equally.

{¶7} The matter proceeded to trial over various dates in November 2011 and December 2011. The central issues of the trial were the value of the husband's medical practice, the present value of $350,000 that the husband invested in a "Centurion Development/Ashford Park L.L.C." real estate project, whether the wife's $264,450 inheritance remained her separate property or became part of the marital estate, whether the husband had received inheritances from his family, the amount and duration of

spousal support for the wife, and whether the wife was entitled to an additional award for her attorney fees.

{¶8} As of the start of the trial, the wife was 50 years old and had worked primarily as a homemaker, and the husband was 54 years old and was a successful plastic surgeon. The parties stipulated that the basis for divorce was incompatibility. According to their joint exhibits, they had a total of $6,200,000 in assets, which included $1,480,000 in retirement assets and the remainder in liquid accounts.

{¶9} Testifying upon cross-examination, the husband stated that he lives in Poland, Ohio. His main medical practice is located in Youngstown, and in 2009, he also opened small offices in Cleveland and Akron. The husband maintained that he earned $143,496 per year, but he acknowledged that he also earns income through personal service contracts with Cynosure and Lumenis, aesthetic laser companies. In addition, in court documents from October 2011, the husband had indicated that his income is $454,638 per year, and in a 2006 mortgage application, he stated that he earned $721,260 per year. The husband admitted that his tax returns indicate that his gross income was $1,090,461 in 2007, $672,840 in 2008, and $564,441 in 2009. He also admitted that he had received some checks, made out to him individually, as payments for medical procedures.

{¶10} The husband testified that the corporation repays substantial loans to him that were used to pay for equipment and expenses. The corporation also pays some of

his personal expenses, such as his American Express bill and his life insurance. Other tax payments and mortgage payments are given to him as corporate "distributions."

{¶11} The husband admitted that his corporate receipts book does not contain entries for the time period from September 11, 2010 to March 17, 2011. He also failed to produce his practice calendar for the time period preceding January 2011. He admitted that he has taken "at least a couple thousand" from the cash proceeds of the practice.

{¶12} The husband acknowledged that his girlfriend works at his practice as the marketing director and patient care counselor, and that she earns $18 per hour. They have gone out of town together on approximately ten occasions in 2011.

{¶13} The husband acknowledged that his wife has had various health problems, and that she worked for a weight loss clinic in the 1980s, and on occasion, she had helped him at his practice. He handled the family's finances for the duration of the marriage. He admitted that his wife had received an inheritance of approximately $264,450, which was deposited into the parties' bank account. This sum was then "spent or invested." The husband acknowledged that in 2002, he deposited approximately $40,000 into a Swiss account, but did not tell his wife about this transaction because they "didn't talk about things like that." The husband also acknowledged that immediately after his wife filed for divorce, he withdrew $50,000 from one of the parties' bank accounts, and he claimed that he used it to pay "golf bets, things like that."

{¶14} The husband also admitted in 2008 that he had invested $350,000 from cash and corporate accounts in a real estate transaction entitled "Centurion Development/Ashford Park L.L.C." He claimed, however, that there was no contract, no commitment, and no agreement concerning the details of the investment. He also claimed that the investment has no present value. He acknowledged that prior to the divorce, he had at least $350,000 in his personal accounts, but as of 2010, the year that the parties filed for divorce, he had approximately $106,000 in the accounts.

{¶15} As to the value of his practice, the husband acknowledged that he has two personal service contracts for educational services for Cynosure and Lumenis, and he deposits these proceeds into personal accounts and not his business office account. He insisted that these proceeds were not practice-related and were personal payments to him.

{¶16} Tana Wilde testified on cross-examination that she is in a romantic relationship with the husband, and that after the relationship started, the husband hired her as his marketing director and patient care counselor. She has accompanied him on trips, but she denied that he has given her spending money or that he has paid for her bills. She acknowledged that she handles the cash for the practice and stated that it is logged into computer records, then locked in a drawer.

{¶17} The wife testified that in 1990 she and each of her brothers inherited approximately $264,450 from her great aunt's estate.[1] She deposited the money into the

---

[1]This testimony was corroborated by Louie Touton des Champs, the wife's brother, who served as the executor of the aunt's estate.

parties' Key Bank account, but the next morning her husband withdrew all of the money. She further testified that her husband controlled the family's finances and that he has the records from these funds and refuses to provide them to her.

{¶18} The wife further testified that she has had surgery on her kidneys, she has kidney and bladder problems, has lost 38 percent of the usage of her right leg, and suffers from post traumatic stress in connection with the husband's alleged prior domestic violence against her and her older son.    She has determined that it will be expensive for her to purchase health insurance in light of these issues.

{¶19} The wife further testified that she applied the $150,000 that the court released to her prior to trial to pay household expenses, items for her children, and her attorney fees.    The wife additionally testified that she learned about the husband's $350,000 "Centurion Development/Ashford Park L.L.C." investment during the course of the litigation, and she opined that the husband had simply given this sum to a friend in order to hide assets during a period of marital discord in 2003.

{¶20} The wife also testified that she suspected that the husband was concealing assets so she searched the house and claimed that she found $230,000.   She also testified that she learned from the husband's employees that he was keeping cash in the Youngstown office; she discovered $73,000 hidden there.    According to the wife, throughout the course of the marriage, the couple regularly used cash to pay for bills and expenses.    She also claimed that he kept a separate ledger for cash receipts.    She

testified that the husband told her that she does not deserve support and threatened to stop working in order to keep her and her sons from getting money.

{¶21} On cross-examination, the wife admitted that she withdrew approximately $75,000 from her younger son's account. She stated that she used this money for day-to-day expenses and to pay attorney fees.

{¶22} Linda Giangardella ("Giangardella") testified that she worked as the husband's plastic surgery coordinator from 2008 to 2010. According to Giangardella, patients who entered into a contract for services were required to pay a nonrefundable deposit of $250, and some patients paid this amount in cash. Giangardella testified that when she started working at the husband's office, she marked in the patient's file that they had paid in cash. She also listed that the money had been given directly to the husband because she did not want to be blamed in the event of a discrepancy. After an office meeting, however, the husband instructed her to simply write "paid in full" in the file and to lock the cash in a drawer, and then to give it to him later. She claimed that the practice had received $10,000 in a single day. She admitted, however, that it was not part of her job to prepare the deposit slips for the practice.

{¶23} The wife presented expert testimony from Bernard Agin, J.D., C.P.A. ("Agin") regarding the value of the husband's medical practice. Agin testified that he reviewed the husband's expert report from Hack, Steer and Co. ("Hack, Steer"), regarding the valuation of the practice, and that he also conducted his own valuation. Agin testified that like the Hack, Steer evaluation, he used the net asset approach to determine

the value of the practice. Agin further testified that the value of the practice as determined by Hack, Steer, which was $16,500, was too low for several reasons.

{¶24} First, the Hack, Steer report listed loans from the husband in the amount of $220,000 as a corporate liability. According to Agin, the loan paid to the corporation should have been listed as an asset for the sole shareholder, the husband. Another listed a three-year debt in the amount of $40,000, and the creditor, Surgeon's Advisory, made no attempt to collect it. Second, the Hack, Steer report did not contain a value for the goodwill of the practice. According to Agin, an accepted standard, the Goodwill Registry, provides a value for the goodwill of such practices, and he added $171,000 for this value. Third, Agin testified that the husband realized or collected about 70 percent of his receivables, and not 30 percent as the Hack, Steer report indicated. Finally, after speaking with the wife and one of the husband's former employees, Agin opined that the practice takes in approximately $200,000 in cash each year that is not reported. Combining all of the foregoing, along with the assets of the practice, Agin opined that the total assets of the practice totaled $693,874, and after deducting for liabilities, he opined that the fair market value of the practice was $679,000. Agin additionally testified that excluding the imputed unreported additional cash revenue, the fair market value of the practice is $486,330.

{¶25} Proceeding to the husband's case, the husband presented testimony from Steve Steer ("Steer"), a C.P.A. with Hack, Steer. Steer testified that he used the asset method of valuation. He assessed financial information from the husband's practice,

including the depreciation schedules, payables, long-term debts, and equipment values. Steer also researched the values of comparable practices and visited the Youngstown office. Steer testified that he considered depreciation expenses, tax effect of the income, receivables, and the value of inventory on hand. He deducted $220,000, a debt that the practice owes the husband, a bill for $67,650 for website development, a $40,000 debt owed to Surgeon's Advisory, taxes, and also determined there was no value for the goodwill of the practice. Steer then opined that the practice has a fair market value of $16,300.

{¶26} Steer admitted on cross-examination, however, that the global trend shows an increase in the performance of plastic surgeries, and the husband's own income had increased from 2007 to 2008. Steer did no checks to determine whether the husband was voluntarily suppressing his income during the pendency of the divorce or had hidden assets, and some of the equipment values were provided by the husband without independent valuation. Steer also admitted that, although the husband told him that he had received no distributions in 2010 and 2011, the husband did in fact receive distributions, a form of payments in 2010. Steer also excluded the husband's consulting income from laser companies. Finally, Steer admitted that the IRS would consider the family's lifestyle to determine whether all of the income was being reported or not.

{¶27} The husband testified on his own behalf and stated that he opened the Youngstown office in 1988. He rented additional, smaller offices in Cleveland and Akron. He stated that 10-15 percent of his gross receipts are in the form of cash. In

2006, he reported earnings of $146,904. In 2008, he reported wages of $333,709. In 2009, he reported wages of $148,305.

{¶28} The husband admitted that in 2002, he deposited approximately $40,000 into a bank account in Sarasin, Switzerland, but he stated that this was for purposes of conducting international business. He stated that he inherited $50,000 from his parents' estate and $30,000 from his uncle's estate that he invested, but he did not have records from those inheritances. The husband further claimed that his business had suffered due to the economic downturn and also due to the wife's domestic abuse allegations.

{¶29} The husband's accountant, Stephen Higgins ("Higgins"), testified that the husband's medical practice is a Subchapter S corporation ("S corporation"), so it does not pay corporate income tax, but instead provides a Schedule K1 to the shareholder for his or her individual tax return. In 2010, the corporation had gross receipts of $1,096,082. The corporation then listed deductions of $404,212, and net income of $155,000. Some of the husband's expenses are paid through the corporation, however, and are either charged to the corporation or reclassified as personal disbursements to him.

{¶30} Higgins further testified that the husband and wife had filed joint returns, but he acknowledged that he had not received a signed authorization from the wife consenting to the joint filing.

{¶31} Higgins further testified that in 2010, the husband had wages of $148,044, interest income of $11,107, dividends of $98,875, a loss of $372, income from the S

corporation of $157,725, and other income of $12,908, for a total of $422,287. Under these calculations, the husband has income of $15,742 per month.

{¶32} On cross-examination, Higgins acknowledged that if cash receipts were not recorded, they would not be reflected in the husband's income tax returns, and that consulting income should also be included within the corporate income. Higgins was also unaware of any losses from the "Centurion Development/Ashford Park L.L.C." real estate transaction.

{¶33} Vocational expert Barbara Burke testified that she conducted an employability assessment on the wife. She stated that the wife obtained a marketing degree in 1985 and had worked for about 14 months during the marriage. Burke testified that the wife has very good verbal skills and interacts well with others. She opined that the wife was capable of working as a receptionist, customer service representative, or school secretary and could earn between $20,000 to $25,000 per year.

{¶34} Finally, the wife's attorney testified regarding attorney fees. He testified that he was retained in 2010 and represented the wife from that date to the present. He charged $400 per hour but his rate increased to $450 in 2011. He bills $250 for associates and $125 for paralegals. He described the efforts exerted in obtaining the husband's personal and corporate tax records, locating assets, and ascertaining the husband's income and the value of the practice. The firm worked on the case for a total of 762.13 hours and had total expenditures, including attorney fees and expenses of $298,654.

{¶35} On February 17, 2012, the trial court issued its final decree in the matter, a thoughtful and meticulous 48-page judgment entry with detailed findings of fact and well-reasoned conclusions of law. In relevant part, the trial court concluded that the value of the husband's medical practice is $227,277. The court also found that the present value of the "Centurion Development/Ashford Park L.L.C." real estate project remained $350,000. The court additionally concluded that the wife's $265,450 inheritance had become commingled, but the court separated it from the marital estate and awarded this sum to the wife. The court concluded, however, that the husband had not properly proven his claim that he received $80,000 in inheritances.

{¶36} The trial court applied the factors set forth in R.C. 3105.171(F), and awarded the husband $3,414,908 of the marital estate (including the medical practice, the "Centurion Development/Ashford Park L.L.C." investment, a portion of the American Funds and the majority of the Morgan Stanley funds), and awarded the wife $3,642,340 of the marital estate (including portions of the American Funds and the Morgan Stanley funds, and all of the Vanguard funds).

{¶37} The court also concluded that the wife could be expected to earn approximately $20,000 per year, and that the husband's income for purposes of determining spousal support, is $400,000 per year. The trial court ordered the husband to pay the wife $12,000 per month in spousal support for 90 months, or 7.5 years. Finally, the court considered additional evidence on the issue of attorney fees and awarded the wife an additional $75,000 for attorney fees.

**{¶38}** The wife appeals and assigns four errors for our review. The husband cross-appeals and assigns eight errors for our review. We will address the parties' assignments of error together where they share a common basis in the record or in the law.

**{¶39}** The wife's first assignment of error states:

The trial court erred as a matter of law [and abused its discretion] in its determination of spousal support in the amount and duration of the support order.

**{¶40}** The husband's fourth assignment of error in his cross-appeal states:

The trial court erred by awarding Mrs. Gentile unreasonable and inappropriate spousal support and child support, which included an extrapolation of Guideline Support, private school tuition, and related expenses, extraordinary expenses of the child, mortgage payments on two properties, retroactive support, and attorney fees, all contrary to R.C. 3105.18(B) and R.C. 3119.04(B).

**{¶41}** The wife insists that she is entitled to a greater award and an indefinite award, in light of the duration of the marriage and the parties' significant assets. The husband, on the other hand, complains that the award is too high and the child support award is too high, given the other assets awarded to the wife.

Spousal Support

**{¶42}** As a general matter, we review spousal support issues under an abuse of discretion standard. *See Dunagan v. Dunagan*, 8th Dist. No. 93678, 2010-Ohio-5232, ¶ 12. So long as the decision of the trial court is supported by some competent, credible evidence going to all the essential elements of the case, we will not disturb it. *Neumann v. Neumann*, 8th Dist. No. 96915, 2012-Ohio-591, citing *Masitto v. Masitto*, 22 Ohio St.3d 63, 66, 488 N.E.2d 857 (1986).

**{¶43}** In determining whether to grant spousal support and in determining the amount and duration of the payments, the trial court must consider the factors listed in R.C. 3105.18. *Robinson v. Robinson*, 8th Dist. No. 97933, 2012-Ohio-5414. The factors the trial court must consider include each party's income, earning capacity, age, retirement benefits, education, assets and liabilities, and physical, mental, and emotional condition; the duration of the marriage; their standard of living; inability to seek employment outside the home; contributions during the marriage; tax consequences; and lost income due to a party's fulfillment of marital responsibilities. R.C. 3105.18(C)(1)(a)-(m). In addition, the trial court is free to consider any other factor that the court finds to be "relevant and equitable." R.C. 3105.18(C)(1)(n).

**{¶44}** The trial court is not required to comment on each statutory factor; the record need only show that the court considered the statutory factors when making its award. *Neumann* at ¶ 17, citing *Carman v. Carman*, 109 Ohio App.3d 698, 703, 672 N.E.2d 1093 (12th Dist.1996). If the record reflects that the trial court considered the statutory factors and if the judgment contains detail sufficient for a reviewing court to

determine that the support award is fair, equitable, and in accordance with the law, the reviewing court will uphold the award. *Daniels v. Daniels*, 10th Dist. No. 07AP-709, 2008 Ohio App. LEXIS 772 (Mar. 4, 2008), citing *Schoren v. Schoren*, 6th Dist. No. H-04-019, 2005-Ohio-2102.

**{¶45}** In this matter, the trial court, in pages 21-28 of its analysis, separately addressed each of the factors set forth in R.C. 3105.18 in relation to the evidence presented at trial. Applying R.C. 3105.18( C)(1)(a),(b), (f), (h), and (k), the court found that the parties' minor child was 16 years old, and that based upon the wife's current education and skills she was capable of working outside the home and had the potential to earn approximately $20,000 per year. The court noted that the husband had a thriving medical practice, and the court concluded that his income is approximately $400,000. This figure reflected the court's rejection of the wife's claim that the husband had failed to report additional cash skimmed from the practice, noting that "perhaps [the husband] did skim some cash. However, there is no way this court can determine how much." The court did note, however, that many of the husband's expenses are paid through the corporation, that the husband's income from 2003 to 2009 had fluctuated from $320,000 to $690,000, and that in the period of the divorce proceedings, the husband's 2010 and 2011 income had dropped.

**{¶46}** Pursuant to R.C. 3105.18(C)(1)(c), the court noted that the wife is 50 years old and has back problems, and that the husband is 54 years old and is in good health. The trial court identified the parties' retirement benefits and divided them equally, as

required pursuant to R.C. 3105.18(C)(1)(d). In accordance with R.C. 3105.18(C)(1)(e),(g), (i), (j), and (m), the court observed that the parties had been married for 25 years, enjoyed a "very nice upper middle class standard of living," had substantial assets that generate income, interest, and dividends, and that the wife "certainly was [the husband's] partner" in attaining the marital assets. Pursuant to R.C. 3105.18(C)(1)(l), the court addressed the tax consequences, observing that the spousal support would be a deduction for the husband, income for the wife, and that the husband was awarded the dependency deduction for the minor child. Based upon all of the foregoing, the trial court awarded the wife $12,000 per month in spousal support for 7.5 years.

{¶47} From the foregoing, the decision of the trial court is well supported in the record, and there is competent, credible evidence going to all of the statutory elements for establishing a spousal support order. Therefore, we find no abuse of discretion in connection with this award. The wife insists, however, that under pending legislation, House Bill 348, she would be entitled to receive spousal support indefinitely because the marriage lasted over 25 years. We will not apply pending legislation that is not presently in effect, so we reject this argument. Further, insofar as the husband complains that he was ordered to make the mortgage payments, we note that the order actually indicates that each party shall pay 50 percent of the mortgages taxes and expenses for the Solon and Bradenton homes. This claim therefore lacks support in the record.

Child Support

**{¶48}** A trial court has broad discretion to calculate child support and, absent an abuse of discretion, an appellate court will not disturb a child support order. *Pauly v. Pauly,* 80 Ohio St.3d 386, 390, 1997-Ohio-105, 686 N.E.2d 1108.

**{¶49}** In general, the amount of child support calculated using the child support guidelines and worksheet is rebuttably presumed to be the correct amount of child support, although the trial court may deviate from that amount. R.C. 3119.03; *Marker v. Grimm*, 65 Ohio St.3d 139, 601 N.E.2d 496 (1992), paragraph one of the syllabus. However, when the parents' income exceeds $150,000, R.C. 3119.04(B) "leaves the determination entirely to the court's discretion." *Brownlee v. Brownlee*, 8th Dist. Nos. 97037 and 97105, 2012-Ohio-1539. In *Brownlee*, this court explained:

> R.C. 3119.04(B) expressly prohibits a trial court from awarding less than the amount computed under the basic child support schedule and applicable worksheet corresponding to a combined gross income of $150,000 unless the court finds that "it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount." This court has consistently held that in determining child support obligations pursuant to R.C. 3119.04, trial courts must proceed on a case-by-case basis and generally do not have to state reasons for doing so. *Keating v. Keating*, 8th Dist. No. 90611, 2008-Ohio-5345, ¶ 84. Further, "the statute does not require any explanation of its decision unless it awards less than the amount awarded for combined incomes of $150,000."

*Brownlee* at ¶ 26, [quoting *Cyr v. Cyr*, 8th Dist. No. 84255, 2005-Ohio-504, ¶ 54].

**{¶50}** In this matter, the court correctly observed that "the combined gross income of the parents is significantly greater than $150,000 per year" and that support was therefore to be determined on a case-by-case basis. The court noted that the child attends University School. Considering the needs and standard of living of the minor child, the

court concluded that a fair, just, and equitable award is $2,096.56 per month if private health insurance was provided, and $2,063.91 per month without private insurance. The trial court's award is well supported in the record and we find no abuse of discretion.

{¶51} The wife's first assignment of error and the husband's fourth assignment of error are without merit.

{¶52} The wife's second assignment of error states:

The trial court erred and abused its discretion in failing to find that [husband] engaged in financial misconduct by failing to make a distributive award to [wife] due to [husband's] improper conduct.

{¶53} The husband's sixth assignment of error in his cross-appeal states:

The trial court erred by making an inequitable, unjust and unequal division of marital property based upon consideration of "marital fault" in violation of R.C. 3105.171(C)(1) and bias toward [husband] as demonstrated by inconsistent and improper evidentiary rulings.

{¶54} The husband's eighth assignment of error in his cross-appeal states:

The trial court erred by awarding retroactive spousal support to [the wife] when she unilaterally withdrew $75,000 from her son's custodial account and her bank accounts at the time of filing for divorce and without ever having accounted for disposition of [those] funds.

{¶55} A trial court has broad discretion to make distributive awards to a spouse, pursuant to R.C. 3105.171(E), in order to compensate for the financial misconduct of the

other spouse. *Hvamb v. Mishne*, 11th Dist. No. 2002-G-2418, 2003-Ohio-921, ¶ 14, citing *Lassiter v. Lassiter*, 1st Dist. No. C-010309, 2002-Ohio-3136. *See also MacDonald v. MacDonald*, 8th Dist. No. 96099, 2011-Ohio-5389. Under R.C. 3105.171(E), financial misconduct includes the dissipation, concealment, destruction, or fraudulent disposition of assets. R.C. 3105.171(E)(3). Typically, the offending spouse will either profit from the misconduct or intentionally defeat the other spouse's distribution of marital assets. *Hammond v. Brown*, 8th Dist. No. 67268, 1995 Ohio App. LEXIS 3975 (Sept. 14, 1995).

{¶56} In this matter, the wife insisted that the husband had concealed the $350,000 investment and had also concealed cash income. The court concluded that it "is inconceivable that anyone could invest $350,000 without any paperwork or prospectus indicating what the investment was or how much he had actually invested." The court also noted that despite the fact that the husband insisted that this investment had no present value, he did not claim it as a tax loss. Nonetheless, the court concluded that "there was not sufficient evidence for the Court to find there was economic misconduct." The court also found "no real evidence" of the total of any skimmed and unreported cash. We find no abuse of discretion. Although the husband had acted deceptively in relation to the $350,000 investment, in the end, he did not profit from his actions or defeat the wife's distribution. Similarly, while the record is clear that the husband accepted cash at the practice, the trial court did not abuse its discretion insofar as it refused to impute unreported income to him.

**{¶57}** As to the husband's complaint that the wife depleted $75,000 from the son's bank account, the evidence of record clearly indicated that the wife used this sum to pay household and family expenses and also paid attorney fees related to the motion for support pendente lite. No marital fault was established in relation to this sum.

**{¶58}** As to the husband's claim that the trial court was biased against him, we note that such challenges cannot be raised in an appellate court and must instead be raised under the provisions of R.C. 2701.03, which requires an affidavit of prejudice to be filed with the Supreme Court of Ohio. *Fisher v. Fisher*, 8th Dist. No. 95821, 2011-Ohio-5251. Courts of appeals lack authority to void the judgment of a trial court on such basis. *Id.*

**{¶59}** The wife's second assignment of error and the husband's sixth and eighth assignments of error are without merit.

**{¶60}** The wife's third assignment of error states:

The trial court erred as a matter of law and abused its discretion by using an improper value of Otolaryngology Head and Neck Consultants, PC, Inc.

**{¶61}** The husband's third assignment of error in his cross-appeal states:

The trial court erred in valuing [husband's] medical practice at $227,277 by admitting opinion testimony by [wife's] witness without a proper foundation, by including "goodwill" as a divisible asset, and by arriving at a conclusion not supported by any evidence in the record or valuation method contrary to Evidence Rules 702 and 703.

**{¶62}** A trial court must generally assign and consider the values of marital assets in order to equitably divide those assets. *See Hightower v. Hightower*, 10th Dist. No. 02AP-37, 2002-Ohio-5488, ¶ 22. There is no specific way for the trial court to determine valuation. *Kapadia v. Kapadia*, 8th Dist. No. 94456, 2011-Ohio-2255, citing *Crim v. Crim,* 5th Dist. No. 2007 AP 06 0032, 2008-Ohio-5367; *Focke v. Focke*, 83 Ohio App.3d 552, 615 N.E.2d 327 (2d Dist.1992); *Baker v. Baker*, 83 Ohio App.3d 700, 615 N.E.2d 699 (9th Dist.1992). Courts have recognized several methods for valuing a business, including: (1) straight capitalization; (2) capitalization of excess earnings; (3) the IRS method (know at the "formula" approach), which subtracts a reasonable rate of return on tangible assets and salary from average earnings; (4) market value; and (5) buy-sell agreements. *See Kuper v. Halbach*, 10th Dist. No. 09AP1099, 2010-Ohio-3020, ¶ 13. Moreover, in ascertaining the value of a business, a trial court has discretion to weigh the testimony provided by the parties' valuation experts. *Bryan v. Bryan*, 8th Dist. No. 97817, 2012-Ohio-3691.

**{¶63}** On appeal, our duty is not to require the adoption of any particular method of valuation, but to determine whether, based upon all the relevant facts and circumstances, the court abused its discretion in arriving at a value. *Focke*; *James v. James*, 101 Ohio App.3d 668, 656 N.E.2d 399 (1st Dist.1995).

**{¶64}** In this matter, both the expert for the wife and the expert for the husband used the net asset approach to determine the fair market value of the practice. The wife's expert opined that the practice was worth $679,000, and the husband's expert testified

that it was worth $16,300. The trial court noted that the wife's expert had not considered a $220,000 loan that the husband had given to the practice, and had not deducted a $40,000 debt owed to Surgeons Advisory. The trial court subtracted $220,000 from the value of the practice, then included this same sum as an additional asset of the parties. The court also determined that the Surgeons Advisory amount was not a true liability because this debt was three years old and no efforts were made to collect upon it. The trial court also noted that the husband's expert attributed no additional goodwill value to the practice, whereas the wife's expert testified that the Goodwill Registry provides a value of $171,000 for such practices. The trial court accepted this figure, but it did not credit the wife's expert's contention that the practice earned an additional $200,000 each year in unreported cash. The trial court then determined that the practice had a total of $333,071 in assets, $171,000 in goodwill, and $204,300 in debt, $72,494 in liabilities, bringing its total value to $227,277. The trial court carefully considered all of the evidence of record in deriving each of its calculations. Based upon all the relevant facts and circumstances, the court did not abuse its discretion in establishing the fair market value of the husband's medical practice.

{¶65} The wife's third assignment of error and the husband's third assignment of error are without merit.

{¶66} The wife's fourth assignment of error states:

The trial court erred as a matter of law and abused its discretion to the prejudice of [the wife] for failing to award [the wife] all of her attorney fees and litigation expenses.

**{¶67}** The husband's fifth assignment of error in his cross-appeal states:

The trial court acted contrary to R.C. 3105.73 by ordering [the husband] to pay $75,000 toward [the wife's] legal fees. After having awarded [the wife] nearly $4,000,000 of liquid assets and unreasonable and inappropriate spousal and child support that exceeds his ability to pay.

**{¶68}** Our review of the award of attorney fees is limited to determining (1) whether the factual considerations upon which the award was based are supported by the manifest weight of the evidence, or (2) whether the domestic relations court abused its discretion. *Neumann*, 8th Dist. No. 96915, 2012-Ohio-591, at ¶ 6, citing *Gourash v. Gourash*, 8th Dist. Nos. 71882 and 73971, 1999 Ohio App. LEXIS 4074 (Sept. 2, 1999), and *Oatey v. Oatey*, 83 Ohio App.3d 251, 614 N.E.2d 1054 (8th Dist.1992).

**{¶69}** Pursuant to R.C. 3105.73(A), a court may award all or part of reasonable attorney fees and litigation expenses to either party if the court finds the award equitable. In determining whether such an award is equitable, "the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." R.C. 3105.73(B); *Mlakar v. Mlakar*, 8th Dist. No. 98194, 2013-Ohio-100.

**{¶70}** Here, the trial court noted that this "was a very complex trial," and that it was difficult to comb through thousands of records and understand the operation of the medical practice. In a very detailed and thoughtful analysis, the court addressed all of the parties' disputed issues and considered all of their assets. The court observed that the case involved "a great deal of discovery and hard work," that the wife's counsel had to consult with experts and appraisers, and that the husband was not cooperative in

providing some of the documents. The trial court identified the factors set forth in R.C. 3105.73, Rule 1.51(A) of the Rules of Professional Conduct, and Loc.R. 21(B) of the Court of Common Pleas of Cuyahoga County, Domestic Relations Division. The court then awarded the wife $75,000 for her attorney fees, noting that this was approximately 25 percent of her total fees and expenses.

{¶71} From the foregoing, we find no abuse of discretion. The wife's fourth assignment of error and the husband's fifth assignment of error are without merit.

{¶72} The husband's first assignment of error in his cross-appeal states:

The trial court erred by awarding [the husband] a failed real estate investment with no value as a $350,000 asset, contrary to R.C. 3105.171(C).

{¶73} Valuing property involves factual inquiries, requiring an appellate court to apply a manifest weight of evidence standard of review. *Kapadia*, 8th Dist. No. 94456, 2011-Ohio-2255, ¶ 24. An appellate court will not reverse a trial court's valuation if it is supported by some competent, credible evidence. *Id*., citing *Haynes v. Haynes*, 8th Dist. No. 92224, 2009-Ohio-5360.

{¶74} In this matter, the trial court noted that there was no evidence regarding the present value of the $350,000 "Centurion Development/Ashford Park L.L.C." investment, other than the husband's contention that the investment had no value. The court was skeptical of the husband's claims regarding this asset and observed that it "is inconceivable that anyone could invest $350,000 without any paperwork or prospectus

indicating what the investment was or how much he had actually invested." The trial court then found it to be an asset of the marriage with a value of $350,000, which was the cash put into the project. From the foregoing, we conclude that there is ample competent and credible evidence supporting the trial court's valuation of this asset. We therefore find the husband's first assignment of error to be without merit.

{¶75} The husband's second assignment of error in his cross-appeal states:

The trial court erred by awarding [the wife] $265,450 merely because she had inherited that amount of money more than twenty years prior to trial, without requiring evidence of the continued existence of any separate property and without requiring tracing as mandated by R.C. 3105.17(A)(6)(B).

{¶76} Prior to January 1, 1991, courts recognized the doctrine of transmutation, or the process by which property that would otherwise be separate is converted into marital property. *Frederick v. Frederick*, 11th Dist. No. 98-P-0071, 2000 Ohio App. LEXIS 1458 (Mar. 31, 2000). Effective January 1, 1991, however, the legislature adopted R.C. 3105.171(A)(6)(b) which provides:

The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable.

{¶77} This statute supplanted the doctrine of transmutation. *Frederick.* Pursuant to R.C. 3105.171(A)(6)(b),

[t]he act of commingling is no longer determinative. Instead, the traceability of separate property is the paramount concern. In enacting R.C. 3105.171, the General Assembly was codifying the view that if the

right to hold separate property is to be meaningful, then the classification of property as marital or nonmarital must be determined by the source of contributions. Therefore, the only scenario by which transmutation may still occur under the current provisions of R.C. 3105.171 is a situation wherein a spouse is not able to trace his or her separate property.

*Frederick.*

{¶78} The party attempting to prove that the asset is traceable separate property must establish such tracing by a preponderance of the evidence. *Debevec v. Debevec*, 11th Dist. No. 2002-P-0126, 2004-Ohio-2927, ¶ 17, quoting *Price v. Price*, 11th Dist. No. 2000-G-2320, 2002-Ohio-299.

{¶79} Therefore, the wife's $265,450 inheritance that was later invested by the husband was not "transmuted" into marital property. Further, the wife met her burden of tracing the funds to her separate property by a preponderance of the evidence because she and her brother, the executor of the estate, established that these funds came from the estate. Further, the wife credibly testified that after she deposited the money into the parties' Key Bank account, the husband withdrew the money. It was undisputed that the husband handled all of the parties' finances. Therefore, the trial court did not abuse its discretion regarding this sum as the wife's separate property. *Accord Tochtenhagen v. Tochtenhagen*, 11th Dist. No. 2009-T-0011, 2010-Ohio-4557, and *Iacampo v. Oliver-Iacampo*, 11th Dist. No. 2011-G-3026, 2012-Ohio-1790.

{¶80} The husband's second assignment of error in his cross-appeal is without merit.

{¶81} The husband's seventh assignment of error in his cross-appeal states:

The trial court erred by limiting the circumstances under which the spousal support obligation of a physician in a one[-]person practice can be modified pursuant to R.C. 3105.18(E).

{¶82} In this assignment of error, the husband complains that the trial court erred in ordering the spousal support award to be "subject to further order of the Court [i.e., modifiable] only in the event [husband's] health is such that he cannot work."

{¶83} In accordance with R.C. 3105.18(E)(1), a court does not have jurisdiction to modify the amount or terms of the alimony or spousal support unless the court determines that the circumstances of either party have changed and unless the divorce decree or the incorporated separation agreement contains a provision specifically authorizing the court to modify the amount or terms of alimony or spousal support.

{¶84} R.C. 3105.18(F) further provides:

For purposes of divisions (D) and (E) of this section, a change in the circumstances of a party includes, but is not limited to, any increase or involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses.

{¶85} In *Abramovich v. Abramovich*, 9th Dist. No. 19154, 1999 Ohio App. LEXIS 29779 (June 23, 1999), the court explained that it is more appropriate for a court to modify an award of indefinite duration (usually terminating only upon the death or remarriage of the obligee spouse), than it is for a court to modify a limited-time award. The Court explained:

An indefinite award is more appropriately modified, since a greater range of unforeseen changes in circumstance may occur.

The former are considered to be more in the form of a property settlement despite their denomination as "spousal support." *See*, *McClusky v. Nelson* (1994), 94 Ohio App.3d 746, 748-50, 641 N.E.2d 807, discussing *Dailey v. Dailey* (1960), 171 Ohio St. 133, 167 N.E.2d 906, and *Vaught v. Vaught* (1981), 2 Ohio App.3d 264, 441 N.E.2d 811. A court will generally be without any authority to modify an award for a term of years out of deference to the obligee spouse's financial security from the award. An indefinite award is more appropriately modified, since a greater range of unforeseen changes in circumstance may occur.

{¶86} Therefore, in light of this distinction R.C. 3105.18(E) is inapplicable to provisions for spousal support that terminate on a specific date. *See Hasselbach v. Hasselbach*, 6th Dist. No. S-00-004, 2000 Ohio App. LEXIS 5557 (Nov. 30, 2000), citing *Keck v. Keck*, 7th Dist. No. 98 CA 247, 2000 Ohio App. LEXIS 3691 (Aug. 10, 2000).

{¶87} In this matter, the spousal support award was for 7.5 years. Therefore, R.C. 3105.18(E) is inapplicable. In any event, we find no abuse of discretion, as the court further indicated that the "support [award] cannot be modified upward in the event [husband] makes more than $400,000 per year."

{¶88} This assignment of error is without merit.

{¶89} The wife's assignments of error are without merit, and the husband's assignments of error in his cross-appeal are without merit.

{¶90} Judgment affirmed.

It is ordered that ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, JUDGE

SEAN C. GALLAGHER, P.J., and
EILEEN T. GALLAGHER, J., CONCUR